## THE BISCAYNE.

(District Court, S. D. Florida.   July 1, 1920.)

**1. Collision ☞72 (1)—Mutual faults of dredge and tug.**

A dredge and a tug both *held* in fault for a collision between the tug and the pipe line from the dredge to the shore, where the dredge was not working and had notice in time to disconnect the pipe line, and the tug, by stopping until the disconnection was made, could have avoided the injury.

**2. Collision ☞130—Interest not allowable for unnecessary delay in submission of case.**

Interest on the recovery in a collision case disallowed, where the case had been pending 12 years before submission.

In Admiralty.   Suit for collision by the Atlantic Coast Line Railroad Company against the tug Biscayne.   Decree for libelant for half damages.

John L. Doggett, of Jacksonville, Fla., for libelant.
N. P. Bryan, of Jacksonville, Fla., for respondent.

CALL, District Judge.   On September 19, 1906, a collision occurred between the tug Biscayne and the pipe line of the dredge Port Tampa. The dredge was engaged in deepening a channel in front of the docks of the libelant down the river from Commodore's Point, with her pipe running to the shore under the docks.

On that morning the tug came down the river, passing the dredge to the eastward, and made fast to a three-masted schooner preparatory to taking her to sea.   The schooner was loaded with lumber and drawing some inches over 16 feet.

The libel was filed March 9, 1908, claiming damage to the dredge and pipe line by reason of the collision.   There is nothing to show when the first testimony was taken, but additional testimony appears to have been taken on May 12, 1910, June 15, 1915, and October 8, 1915, and deposition de bene esse of Arthur H. Hunter, in New York, June 1, 1915.

Usually evidence in collision cases is contradictory and irreconcilable, when the testimony of the different witnesses is taken soon after the accident, and the instant case is an example.   The lapse of time between the giving of the testimony but adds to the difficulty of arriving at a satisfactory solution.

The undisputed facts may be stated as follows:   The suction dredge Port Tampa was anchored somewhere about the middle of the channel being dredged in front of the docks of the libelant, with her pipe line out west to the land under the docks.   On the morning of September 19, 1906, the tug Biscayne came down the river from the south, passed on the east side of the dredge, to a dock below the dredge, for the purpose of taking a loaded schooner to sea.   The tug made fast to the schooner, taking her alongside; the bow of the tug being toward the

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

stern of the schooner. She lay alongside of the schooner an hour or more.

As I understand the situation, the channel to these docks was dredged some 400 or 500 feet wide, with a depth of about 19 feet, although this depth was not continuous, and the dredge was engaged in deepening this channel at the time of the collision. On that morning the dredge was not pumping, only two of her crew being aboard. The captain was ashore on business; the other members of her crew were under the dock, making some repairs to the pipe line. It was necessary for the tug to take the schooner up the river through this channel to the main channel of the river before she could go to sea. This could be done, either by going to the eastward of the dredge (the way she came in) or through the pipe line. Recognizing the necessity for opening the pipe line to allow vessels to pass through, provision to do so was made by the dredge crew.

The libelant claims that there was ample depth of water and width of channel for the tug to have taken the schooner to the eastward of the dredge. This is denied by the tug. It is also claimed by the libelant that the tug was negligent in not giving notice of her desire to have the pipe line opened in sufficient time to have this done; whereas, the tug claims to have given this notice on her way in by megaphoning to the dredge as it passed.

I am not in position to say from the testimony before me whether there was sufficient depth and width of channel for the tug with the vessel to have passed to the eastward of the dredge; but I think it is not necessary to decide this question, as the tug captain had a right to exercise his judgment as to the safest course to pursue, and had a right to have the pipe line opened for his passage, if in his judgment that was the safest.

There are two questions to be answered in this case: First, was the tug negligent? and, second, if she was, was the dredge also negligent?

[1] As to the first question, if the tug, without sufficient notice to the dredge to open her pipe line, ran into it in the light of day, there was negligence and liability for the damage occasioned; or if she ran into the pipe line, even after such sufficient notice, when the same could have been avoided, there would be liability. Was sufficient notice given to open the pipe line? If the tug captain's testimony is true, notice was given in ample time, according to the testimony of all the witnesses, to have had the pipe line opened; but this was not done, and no attempt made to do so, until the mate heard the tug's whistle and ran out on the pipe line with a wrench, but too late to accomplish his mission. At this time only the chief engineer and one oiler were aboard the dredge, and they came from the engine room to the deck, but made no effort to open the pipe line. It must be borne in mind that at this time the dredge was not pumping, and the pipe line was not in use, and obstructed navigation to the channel.

The testimony of the respondent is to the effect that the tug and tow drifted into the pipe line; but it seems to me that the damage done by the collision, as testified to, shows that the tug and tow must have been going at a greater speed than would have been the result of the

tide, just turned flood in that locality. It must have taken a very considerable force to have broken the spud of the dredge. The possession of the wrench by the mate with which the pipe line could be opened, unaccounted for in the testimony, would seem to corroborate the testimony of the tug that notice that she expected to take the schooner through the pipe line was given those on the dredge. There is no doubt that a whistle was sounded by the tug, which is a matter of dispute. However, it seems to me that it was negligence on the part of the dredge, under the circumstances, not to have its pipe line opened for navigation of the channel. There are no circumstances shown in the testimony which relieve the tug from the duty of avoiding the collision, or justifies the belief that it would be opened in time to let her through. Nor is any valid reason assigned why the tug did not reverse her engine, when it became apparent that the pipe line was intact, in time to prevent the collision.

I am of opinion that both the tug and the dredge were guilty of negligence contributing to the damage suffered.

Now, as to the amount of the damage: The testimony shows that libelant claims the value of the timber out of which the spud was made, and this is allowed. It also claims wages for the crew and a carpenter in shaping the timber; the wages paid the carpenter is a proper element. It also claims an amount per day for the days the dredge was unable to operate, in which the wages of the crew is again considered. It would be a double allowance of the wages for the crew of the dredge to allow the amount both in shaping the timber and also in computing the amount lost by the dredge for the time she could not operate. Therefore I disallow wages to the crew in shaping the timber, but allow $50 a day for the days the dredge could not operate; the aggregate of these amounts to be divided by two, and a decree for this last amount to be entered in favor of the libelant.

[2] Interest is asked by libelant on the amount decreed. It does not strike me as equitable to allow interest in a case like the present, when the damage occurred in 1906, libel filed in 1908, and the case brought to a hearing in 1920, upon testimony taken from 1910 to 1915.